UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| NULANKEYUTMONEN | ) | |
| NKIHTAQMIKON, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | CV-05-168-B-W |
| v. | ) | |
| | ) | |
| ROBERT K. IMPSON, | ) | |
| Acting Regional Director, Eastern | ) | |
| Region, Bureau of Indian Affairs, et al. | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON DEFENDANTS' MOTION TO DISMISS THE COMPLAINT**

Nulankeyutmonen Nkihtaqmikon[1] (NN) is a group of private citizens who are residents of the Pleasant Point Passamaquoddy Reservation (Pleasant Point Reservation) in Maine.[2] Formed to oppose construction of a Quoddy Bay Liquefied Natural Gas (LNG) terminal on the Pleasant Point Reservation, NN has filed civil actions seeking declaratory and injunctive relief against the Bureau of Indian Affairs (BIA) and the Department of the Interior. Specifically, Plaintiffs seek a declaration that the BIA violated federal law in approving a ground lease between the Passamaquoddy Tribe at Pleasant Point, Maine (Tribe) and Quoddy Bay, LLC (Quoddy Bay). Arguing that Plaintiffs lack standing on all claims and that several of their claims are not ripe, Defendants seek dismissal of the complaint under Rule 12(b)(1) of the Federal Rules of Civil Procedure. This Court finds that it lacks jurisdiction to adjudicate this matter, and

---

[1] Nulankeyutmonen Nkihtaqmikon means "We Protect the Homeland." *Compl.* ¶ 5.
[2] The six other Plaintiffs are suing in their individual capacities. They are each members of the Tribe and residents of the Pleasant Point Reservation. They allege that they participate in a variety of religious, cultural, and ceremonial uses of Split Rock, an area they allege will be transformed into an industrial zone if BIA's approval stands.

therefore grants Defendants' motion to dismiss and supplemental motion to dismiss (Docket #s 12 and 32).

## I.   Procedural History

Before proceeding further, it is worth sifting through the case's procedural history.  On November 2, 2005, Plaintiffs filed suit in this Court, asserting violations of the National Environmental Policy Act (NEPA), the Indian Long-Term Leasing Act (Leasing Act), the National Historic Preservation Act (NHPA), and the Administrative Procedure Act (APA).  *Compl., Nulankeyutmonen Nkihtaqmikon v. Impson,* No. 05-168 (D. Me. Nov. 2, 2005).  On January 24, 2006, Defendants moved to dismiss Plaintiffs' Complaint.  *See Defs.' Mot. to Dismiss, Nulankeyutmonen Nkihtaqmikon v. Impson,* No. 05-168 (D. Me. Jan. 24, 2006) (*Defs.' Mot.*).

On April 18, 2006, the same parties initiated a second civil action, alleging violations of the Endangered Species Act (ESA) arising from the approval of the ground lease by the BIA.  *Compl., Nulankeyutmonen Nkihtahkomikumon v. Kempthorne,* No. 06-50 (D. Me. Apr. 18, 2006).[3]  To complicate matters, on May 17, 2006, Plaintiffs to Civil No. 05-168 filed an Amended Complaint alleging an additional violation of the Religious Freedom Restoration Act (RFRA) and the American Indian Religious Freedom Act (AIRFA).  *First Amended Compl., Nulankeyutmonen Nkihtaqmikon v. Impson,* No. 05-168 (D. Me. May 17, 2006).[4]

On June 1, 2006, the parties jointly sought to consolidate civil actions 05-168 and 06-50, and on June 8, 2006, this Court ordered consolidation.  *See Joint Mot. to Consolidate Cases, Nulankeyutmonen Nkihtaqmikon v. Impson,* No. 05-168 (Docket # 29); *Order Granting Without*

---

[3] Despite the slight difference in spelling, the plaintiffs under these two docket numbers are one and the same.
[4] There is yet another law suit between these parties, *Nulankeyutmonen Nkihtaqmikon v. Bureau of Indian Affairs,* No. 05-188, dealing with a claim under the Freedom of Information Act.  The Court has separately issued an Order in that case.

*Objection Mot. to Consolidate Cases, Nulankeyutmonen Nkihtaqmikon v. Impson*, No. 05-168 (Docket # 30); *Nulankeyutmonen Nkihtaqmikon v. Impson*, No. 06-50 (Docket # 11).   After consolidation, Defendants filed a Supplemental Motion to Dismiss on July 3, 2006, arguing that Plaintiffs' additional ESA, RFRA, and AIRFA claims fell afoul of the same standing and ripeness concerns raised in the earlier motion to dismiss.  Defs.' *Suppl. Mot. to Dismiss* (Docket # 32) (*Suppl. Mot.*).  On August 21, 2006, NN filed a stipulation of dismissal of Count 5 of their First Amended Complaint, which contained the RFRA, AIRFA, and Trust Obligation claims.  *First Am. Compl.* at 24 (Docket # 28); *Stip. of Dismissal of Count 5 Without Prejudice of Count Five of Plaintiff's First Am. Compl. and Filing of Pls.' Second Am. Compl.* (Docket # 38).  Plaintiffs' Second Amended Complaint, filed the same day, removed only the claims under RFRA and AIRFA and reasserted the Trust Obligation claim in a new Count 2.  *Second Am. Compl.* at 21.  For the purpose of Defendants' motion to dismiss and supplemental motion to dismiss, the Plaintiffs are left with claims under:  (1) NEPA; (2) the Indian Long-term Leasing Act; (3) NHPA; (4) APA; and (5) ESA.[5]

## II.    Standard of Review

Rule 12(b) provides in relevant part:  "[e]very defense, in law or fact, to a claim for relief in any pleading . . . shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion:  (1) lack of jurisdiction over the subject matter . . . ."  Fed. R. Civ. P. 12(b)(1).  "A motion to dismiss an action under Rule 12(b)(1) . . . raises the fundamental question whether the federal district court has subject matter jurisdiction over the action before it."  *United States v. Lahey Clinic Hosp.,*

---

[5] The ESA claim was a stand alone cause of action under 06-50 until June 8, 2006, when the Court at the parties' joint request consolidated the two actions.  *See Order* (Docket # 11).  Once consolidated, it would have been better practice for the Second Amended Complaint, which was filed on August 21, 2006, well after the consolidation, to include an ESA count.

*Inc.,* 399 F.3d 1, 8 n.6 (1st Cir. 2005) (citation omitted).  The burden falls on the plaintiff

"clearly to allege facts demonstrating that he is a proper party to invoke federal jurisdiction."

*Dubois v. United States Dep't of Agric.,* 102 F.3d 1273, 1281 (1st Cir. 1996) (citation and

internal quotation marks omitted).  *See also R.I. Ass'n of Realtors v. Whitehouse,* 199 F.3d 26, 30

(1st Cir. 1999); *Lord v. Casco Bay Weekly, Inc.,* 789 F. Supp. 32, 33 (D. Me. 1992).[6]

In a Rule 12(b)(1) motion, "[t]he court, without conversion, may consider extrinsic

materials and, to the extent it engages in jurisdictional factfinding, is free to test the truthfulness

of the plaintiff's allegations."  *Dynamic Image Technologies, Inc. v. United States,* 221 F.3d 34,

37-38 (1st Cir. 2000).  *See also Aversa v. United States,* 99 F.3d 1200, 1209-10 (1st Cir. 1996)

("In ruling on a motion to dismiss for lack of subject matter jurisdiction . . . the district court

must construe the complaint liberally, treating all well-pleaded facts as true and indulging all

reasonable inferences in favor of the plaintiff . . . .  In addition, the court may consider whatever

evidence has been submitted . . . .").  Here, the parties have introduced into the record and relied

on six affidavits by the individual Plaintiffs, along with five additional documents the majority of

which formed a part of the administrative record, which this Court will consider in ruling on the

motion.[7]

---

[6] Plaintiffs cite *Valentin v. Hosp. Bella Vista,* 254 F.3d 358, 363 (1st Cir. 2001), for the proposition that in a 12(b)(1) motion when the legal sufficiency of the facts are challenged, and not the facts themselves, the court "must credit the plaintiff's well-pleaded factual allegations . . . draw all reasonable inferences from them in her favor, and dispose of the challenge accordingly."  *See Pls.' Opp'n to Defs.' Mot. to Dismiss* at 5 (Docket # 19).  It is true that *Valentin* distinguishes between sufficiency and accuracy challenges and challenges presenting pure questions of law. 254 F.3d at 363.  However, *Valentin* itself notes that pure questions of law, such as issues of ripeness, mootness, and standing, are "beyond the scope of this opinion."  254 F.3d at 363.  *See also Mangual v. Rotger-Sabat,* 317 F.3d 45, 56 (1st Cir. 2003).

[7] The six affidavits filed by Plaintiffs are:  *Aff. of David Moses Bridges* (Docket # 5); *Aff. of Deanna Francis* (Docket # 6); *Aff. of Hilda Lewis* (Docket # 7); *Aff. of Mary Bassett* (Docket # 8); *Aff. of Reginald Joseph Stanley* (Docket # 9); *Aff. of Vera J. Francis* (Docket # 10).  In turn, Defendants attached five exhibits to their motion to dismiss:  Letter from BIA Eastern Area Director (Acting) Franklin Keel to the Environmental Protection Agency dated Nov. 14, 1996; Ground lease agreement submitted by the Pleasant Point Reservation for approval by the BIA; Resolution passed by the Joint Tribal Council dated June 12, 1996; Letter from the Pleasant Point Reservation to Franklin Keel dated May 23, 2005; and, the Categorical Exclusion prepared by the BIA in conjunction with its approval of the ground lease agreement.  *See Exhibit Decl.* (Docket # 12 – Attach. 1).

### III.    Factual Background

#### A. The Tribe

The Passamaquoddy Tribe is federally-recognized and consists of two distinct reservation areas:  Indian Township and Sipayik, or Pleasant Point.  *Compl.* ¶¶ 60, 62-64 (Docket # 1).  Each reservation has its own elected tribal government including a Governor, other officers, and a tribal council.  *Letter from BIA Eastern Area Director (Acting) Franklin Keel to the Environmental Protection Agency dated Nov. 14, 1996* at 1 (Docket # 12 – Ex. 1) (*Defs.' Ex. 1*).  A Joint Tribal Council manages lands held in common.  *Id.*  A resolution of this Joint Tribal Council authorizes each entity to lease tribal land within their respective reservations.  *Resolution passed by the Joint Tribal Council dated June 12, 1996* (Docket # 12 – Ex. 3)(*Defs.' Ex. 3*).

#### B.  The Ground Lease

The Tribe executed a ground lease agreement with Quoddy Bay to allow the development of a LNG terminal.  *Letter from the Pleasant Point Reservation to Franklin Keel dated May 23, 2005.* (Docket # 12 – Ex. 4) (*Defs.' Ex. 4*).  This lease was approved by the Tribal Council on May 19, 2005.  *Id.*; *Compl.* ¶ 90.  According to Plaintiff Hilda Lewis, a member of the Tribal Council, the final version of the lease agreement was passed out to Tribal Council members just fifteen minutes before the start of the May 19th meeting.  *Aff. of Hilda Lewis* ¶ 9 (Docket # 7) (*Lewis Aff.*).  During the meeting, Ms. Lewis moved to place a moratorium on any voting until the Tribal Council had an adequate opportunity to review the terms of the lease; the motion was denied and questions about the lease from Council members were disallowed.  *Id.* ¶ 10.  On May 31, 2005, a Tribal Council meeting was held to vote on whether to waive a fair market appraisal of the leased land.  *Id.* ¶ 11.  The Council voted 4-3 in favor of waiving any appraisal.  *Id.*  In

approving the lease and waiving appraisal, the Tribal Council relied on legal advice from an attorney paid by Quoddy Bay. *Id.* ¶ 12. Hilda Lewis informed Defendants of her concerns regarding the lease approval process, but was told by Robert K. Impson, then Director of the BIA for the Eastern Region, that there was "nothing I can do about internal tribal matters." *Id.* ¶ 14. Franklin Keel, Acting BIA Eastern Area Director, later told her that the BIA "must necessarily rely on the actions of the Tribal Council to express the will of the tribe." *Id.* ¶¶ 15-16.

The leased property, known as the Split Rock site, is on Pleasant Point Reservation land. *Def.'s Mot.* Ex. 2 (Docket # 12 – Ex. 2c) (*Ground Lease Agreement*). Split Rock has sacred meaning to the Passamaquoddy people, as it is used for a number of tribal ceremonies, and the location is also an important site for recreational, cultural, and historical purposes. *Compl.* ¶¶ 6, 68.[8] During the initial stage of the lease, the "Permitting Period," Quoddy Bay's use of the premises is limited to:

> [A] non-exclusive right and license to enter upon and restrict access to the Premises, at any time and from time to time, to inspect, to examine, to survey, and to conduct, soil tests, borings, installation of water monitoring wells, and other engineering, geotechnical, archaeological, and architectural tests and studies on the Premises, and otherwise to do that which, in Tenant's reasonable discretion, is necessary to conduct due diligence, to secure Permits and to determine the suitability of the Premises for the LNG Project.

*Ground Lease Agreement* at 16 (Docket # 12 – Exh. 2a). The lease, *in toto,* has a fifty-year duration. *Compl.* ¶ 117.

On May 23, 2005, the Tribe sent the ground lease to the BIA for review and approval. *Defs.' Mot. Ex. 4* at 1; *Ground Lease Agreement* at 86. On June 1, 2005, the BIA approved the ground lease "for site investigation purposes" and subject to a number of conditions. *Defs.' Ex.*

---

[8] The original site, which had been the subject of an earlier referendum requesting approval from voting Passamaquoddy tribal members, was in Gleason's Cove, an area not associated with sacred tribal activities. *Compl.* ¶¶ 84-86. Only tribal members living on the reservation the day of the vote were allowed to vote on that referendum. *Lewis Aff.* at ¶ 6.

5.  Prior to approving the lease, BIA did not execute a fair market value appraisal of the leased land, did not prepare an Environmental Assessment (EA) or any other environmental documents, did not allow an opportunity for public comment or input from affected parties, and gave no consideration to the historic, religious, and cultural significance of Split Rock.  *Compl.* at ¶¶ 101-102, 104, 106.

Contemporaneous to the signing of the lease, the BIA issued a Categorical Exclusion in connection with its approval of the ground lease.  *Defs.' Mot.* Ex. 5 (Docket # 12) (*Categorical Exclusion*).  In doing so, the agency found that the action in question did not trigger any of the categories for which an EA was required by law.[9]  *Id.* at 2-3.  The BIA explained that its lease approval was limited to allowing Quoddy Bay "to investigate the site for a potential . . . [LNG] terminal."  *Categorical Exclusion* at 1.  The BIA made clear the contingent nature of the approval:  "The Bureau of Indian Affairs (BIA) lease approval is solely for the site investigation required for the Federal Energy Regulatory Commission (FERC) permitting process in the development of an Environmental Impact Statement (EIS).  . . .  Continuing the lease beyond the investigation period is contingent upon FERC permit approval, acceptability of the EIS analysis and insignificant impact on the leased property."  *Id.*  The BIA stated that it would be a

---

[9] Specifically, the BIA had to find all of the following statements not to be true:
   1.  This action would have significant adverse effects on public health or safety.
   2.  This action would have an adverse effect on unique geographical features such as wetlands, wild or scenic rivers, refuges, floodplains, rivers placed on nationwide river inventory or prime or unique farmlands.
   3.  This action will have highly controversial environmental effects.
   4.  The action will have uncertain environmental effects or involve unique or unknown environmental risk.
   5.  This action will establish a precedent for future actions.
   6.  This action is related to other actions with individually insignificant but cumulatively significant environmental effects.
   7.  This action will affect properties listed or eligible for listing in the National Register of Historic Places.
   8.  This action will affect a species listed or proposed to be listed as threatened or endangered.
   9.  This action threatens to violate Federal, state, local, or tribal law or requirements imposed for protection of the environment.
*Categorical Exclusion* at 2-3.

"Cooperating Agency" for the EIS development through FERC. *Id.*[10]  BIA approval also required that an "archeologist with the authority to halt work be present to monitor any and all subsurface investigations." *Categorical Exclusion* at 1.  Prior to any ground-disturbing investigations, a phase 1 archaeological site study must be conducted, and work beyond initial site investigation is contingent on the results of that study. *Id.*  In essence, the checklist states that the BIA action of approving the lease for investigation purposes will not adversely affect health or public safety, the environment, or historic properties. *Id.* at 2.[11]

### C.  Nulankeyutmonen Nkihtaqmikon and Split Rock

Split Rock is a small, three-quarter acre beach area abutting Passamaquoddy Bay.  The Plaintiffs, David Moses Bridges, Deanna Francis, Hilda Lewis, Mary Bassett, Reginald Joseph Stanley, and Vera J. Francis are Passamaquoddy tribal members who live near Split Rock or who use the site regularly for ceremonial purposes.[12] *Compl.* ¶¶ 7, 9, 10, 14, 15, 18.  Plaintiffs formed NN to protect sacred tribal land and the surrounding environment because of concerns about the impacts associated with the commitment of Split Rock for industrial development. *Aff. of David Moses Bridges* ¶ 3 (Docket # 5) (*Bridges Aff.*).

### IV.   Discussion

### A.  Ripeness

### 1.  The NEPA and NHPA Claims

---

[10] On March 14, 2006, FERC filed a "Notice of Intent to Prepare an Environmental Impact Statement for the Proposed Quoddy Bay LNG Project, Request for Comments on Environmental Issues and Notice of Public Scoping Meetings." See *Defs.' Supp. Mot.* Ex. 6.  The document indicates that FERC is already in the process of evaluating the LNG project in conjunction with the BIA, among other entities, as cooperating agencies. *Id*.

[11] The Categorical Exclusion Checklist was signed by Franklin Keel, Acting BIA Regional Director; Kurt Chandler, Regional Environmental Scientist; as well as the regional archaeologist.

[12] Mr. Stanley lives only 250 feet from Split Rock and his home is located within the operational zone of the proposed LNG facility. *Second Am. Compl.* ¶ 15.  Ms. Bassett lives a half-mile away, and Mr. Bridges resides less than a mile from Split Rock. *Aff. of Mary Bassett* ¶ 2 (Docket # 8) (*Bassett Aff.*); *Bridges Aff.* ¶ 2.  Plaintiffs and other NN members use Split Rock to conduct traditional tribal rituals such as the Full Moon ceremony and Canoe Launching ceremony, along with weddings, baptisms, and community gatherings. *Compl.* ¶¶ 6, 68.

Defendants' first thrust strikes at Plaintiffs' NEPA and NHPA claims, arguing that because the BIA has not approved the construction and operation of the LNG terminal, and because the lease approval is contingent upon FERC permit approval and EIS development, Counts One and Three should be dismissed as unripe.[13] *Defs.' Mot.* at 9; *Suppl. Mot.* at 16.

Ripeness is a doctrine designed to keep judges from getting ahead of themselves; "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Whitehouse,* 199 F.3d at 33 (quoting *Abbott Labs. v. Gardner,* 387 U.S. 136, 148 (1967)).  A claim is not ripe for adjudication if it rests upon "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States,* 523 U.S. 296, 300 (1998) (quoting *Thomas v. Union Carbide Agric. Prods. Co.,* 473 U.S. 568, 581 (1985) (internal quotation omitted)); *Friends of Marolt Park v. United States Dep't of Transp.*, 382 F.3d 1088, 1094 (10th Cir. 2004) (ruling that a challenge to a proposed highway was not ripe, stating "there is nothing concrete about a highway that may never be built.").

The First Circuit has ruled that ripeness turns on the "fitness of the issues for judicial consideration and the hardship to the parties of withholding court consideration." *W.R. Grace & Co. v. United States EPA*, 959 F.2d 360, 364 (1st Cir. 1992) (citations omitted).  The Supreme Court has laid out three factors for consideration of this issue: "(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented." *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733 (1998).

---

[13] The Defendants raise ripeness only as regards the NEPA and NHPA claims.  They have not made a ripeness argument regarding the Endangered Species Act, Indian Long-Term Leasing Act, Trust Obligation, or the Administrative Procedure Act counts.

Thus, in the context of a review of agency action, ripeness protects "agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Id.* (quoting *Abbott Labs.*, 387 U.S. at 148-49). Claims are fit for review if the agency action is final, and the issue presented is "purely legal, as opposed to factual." *W.R. Grace*, 959 F.2d at 364. A purely legal issue "will not be clarified by further factual development." *Thomas,* 473 U.S. at 581. Considerations of fitness "typically involve[] subsidiary queries concerning finality, definiteness, and the extent to which resolution of the challenge depends upon facts that may not yet be sufficiently developed . . . ." *R.I. Ass'n of Realtors,* 199 F.3d at 33 (citing *Ernst & Young v. Depositors Econ. Prot. Corp.,* 45 F.3d 530, 535 (1st Cir. 1995)).

Relying on Exhibit 5, the Categorical Exclusion, Defendants posit:

> Plaintiffs' current suit is based on a number of premature assumptions. For example, Plaintiffs allege that the BIA's approval of the ground lease "will fundamentally and permanently transform the Split Rock site" from a beach area to an industrial zone . . . Plaintiffs, however, ignore the fact that the BIA's approval was very limited in nature; it expressly did not authorize construction of the project. Rather, the BIA merely authorized the investigation of the Split Rock site to determine if it is suitable for the proposed Liquefied Natural Gas terminal . . . Plaintiffs' suit also assumes that they will be dissatisfied with the environmental analysis regarding the project, which will be completed as part of the Federal Energy Regulatory Commission licensing process . . . . Plaintiffs also contemplate that the BIA's lease approval will, indeed, be continued beyond the initial site investigation period. At this juncture, no one can predict if these events will actually occur.

*Defs.' Mot.* at 9-10 (citations omitted) (emphasis in original). Consequently, Defendants conclude, "it is clear that Plaintiffs' suit is 'premised upon contingent future events that may not occur as anticipated, or indeed may not occur at all', and should be dismissed." *Id.* at 10 (citing *Texas*, 523 U.S. at 300).

10

Plaintiffs attempt to parry Defendants' thrust, insisting that their claims "are fit for review now." *Pls.' Opp'n to Defs.' Mot. to Dismiss* at 16 (Docket # 19) (*Pls.' Opp'n*).  They note that:

> NEPA and NHPA require procedural compliance at the time of the BIA's lease approval . . . .  As alleged in Plaintiffs' complaint, the BIA failed to comply with these required procedural duties when it committed the Split Rock site to industrial development for fifty years.  Plaintiffs' claims are thus overdue . . . .  It is critical to the Court's analysis that Plaintiffs' claims are based on procedural violations.  Plaintiffs are harmed <u>now</u> by the BIA's uninformed and irreversible decision.  This procedural injury has already occurred . . . .

*Id.*  (citations omitted).  In addition to "shut[ting] the door on Plaintiffs' participation in a process that directly affects them," Plaintiffs argue that the lease approval has the status of a law with "immediate legal effect" as Quoddy Bay now holds land use rights which "are a necessary precondition to development" under FERC regulations.[14]  *Pls.' Opp'n* at 16 (citing *Abbott Labs.*, 387 U.S. at 152; 18 C.F.R. § 4.41(h)(4)(i)-(ii)).  They also claim that "the fact that the project may not receive later required licensure is not a basis for finding that the BIA's decision is unfit for review."  *Id.* at 17.  Defendants respond that Plaintiffs have "entirely misconstrue[d] the limited nature of the BIA's approval of a portion of the ground lease agreement."  *Defs.' Reply to Pls.' Opp'n to Defs.' Mot. to Dismiss* at 2 (Docket # 22) (*Defs.' Reply*).

*Ohio Forestry* is instructive.  There, the Sierra Club challenged the lawfulness of a federal land and resource management plan (the Plan) adopted by the United States Forest

---

[14] At oral argument, NN relied heavily on *Bullcreek v. U.S. Dep't of the Interior*, 426 F. Supp. 2d 1221 (D. Utah 2006), which it provided to the court as supplemental authority (Docket # 46).  Although NN attempted to draw distinctions between its case and the so-called "Skull Valley case," the cases are quite similar.  In that case, which dealt with a lease of Indian lands to store spent nuclear fuel on the Skull Valley Indian Reservation, the BIA approved a lease subject to four conditions: "(1) the completion of the Nuclear Regulatory Commission ("NRC") and the BIA's environmental analysis required under the National Environmental Policy Act; (2) the issuance of the environmental impact statement ("EIS"); (3) the issuance of the NRC license with a record of decision ("ROD"); and (4) the incorporation of the mitigation measures identified in the ROD, if any, into the Proposed Lease."  *Id.* at 1224.  Since one of the four conditions was not yet met, the court dismissed plaintiff's claim for lack of ripeness.  The plaintiff's complaint also challenged the BIA's delegation of environmental assessment responsibilities to the NRC, but the court did not reach that issue because the claim was not ripe.  Plaintiffs argue that the ground lease in this case is not of the same conditional nature as the Skull Valley case.  Defendants, on the other hand, argue that the Categorical Exclusion Checklist served the same purpose by providing that the lease was "contingent upon FERC permit approval, acceptability of the EIS analysis and insignificant impact on the leased property."  *Categorical Exclusion Checklist* at 1.

Service pursuant to the National Forest Management Act of 1976 for Ohio's Wayne National Forest on the ground that the plan permitted too much logging and clear cutting. *Ohio Forestry*, 523 U.S. at 728. The Plan itself did not authorize cutting any trees, and before any logging could occur a specific area had to be designated and procedures had to be followed, including compliance with NEPA and providing notice and an opportunity to be heard for those affected. *Id.* at 729-30. Nevertheless, the Supreme Court found that "[d]espite the considerable legal distance between the adoption of the Plan and the moment when a tree is cut, the Plan's promulgation nonetheless makes logging more likely in that it is a logging precondition; in its absence logging could not take place." *Id.* at 730. Finding the case was nonjusticiable, the Court noted: "[t]he Sierra Club . . . will have ample opportunity later to bring its legal challenge at a time when harm is more imminent and more certain." *Id.* at 734. *Ohio Forestry* noted that "depending upon the agency's future actions to revise the Plan or modify the expected methods of implementation, review may turn out to have been unnecessary." *Id.* at 736. Also, "further factual development would 'significantly advance our ability to deal with the legal issues presented' and would 'aid us in their resolution.'" *Id.* at 737 (quoting *Duke Power Co. v. Carolina Envtl. Study Group, Inc.*, 438 U.S. 59, 82 (1978)). The Court concluded the suit was not ripe for review. *Id.* at 739.

Significantly for Plaintiffs in this action, the Court in dicta distinguished forest plans from environmental impact statements, holding that a "person with standing who is injured by a failure to comply with the NEPA procedure may complain of that failure at the time the failure takes place, for the claim can never get riper." 523 U.S. at 737.[15] *See Kern v. Bureau of Land Mgmt.,* 284 F.3d 1062, 1070 (9th Cir. 2002). In explanation, the Court noted that "NEPA, unlike

---

[15] Though dictum, it is a "carefully considered" statement of the United States Supreme Court, and "must be accorded great weight and should be treated as authoritative." *Crowe v. Bolduc,* 365 F.3d 86, 92 (1st Cir. 2004) (citations omitted).

the NFMA, simply guarantees a particular procedure, not a particular result." *Ohio Forestry,* 523 U.S. at 737.  In *Massachusetts v. Watt,* 716 F.2d 946 (1st Cir. 1983), the First Circuit offered more elaboration, in the context of a request for a preliminary injunction:

> NEPA is designed to influence the decisionmaking process; its aim is to make government officials notice environmental considerations and take them into account.  Thus, when a decision to which NEPA obligations attach is made without the informed environmental consideration that NEPA requires, the harm that NEPA intends to prevent has been suffered . . . .  NEPA in this sense differs from substantive environmental statutes . . . .  Moreover, to set aside the agency's action at a later date will not necessarily undo the harm.  The agency as well as private parties may well have become committed to the previously chosen course of action, and new information -- a new EIS -- may bring about a <u>new</u> decision, but it is that much less likely to bring about a <u>different</u> one.  It is far easier to influence an initial choice than to change a mind already made up . . . .  It is appropriate for the courts to recognize this type of injury in a NEPA case, for it reflects the very theory upon which NEPA is based -- a theory aimed at presenting governmental decision-makers with relevant environmental data <u>before</u> they commit themselves to a course of action . . . .

*Id.* at 952 (citations omitted) (emphasis in the original).  *See also West v. United States Dep't of Transp.,* 206 F.3d 920, 930 n.14 (9th Cir. 2000) (in a discussion of ripeness, examining the harm involved in the NEPA violation and citing  *Sierra Club v. Marsh,*  872 F.2d 497, 500 (1st Cir. 1989) for the proposition that "harm consists of the added risk to the environment that takes place when the governmental decisionmakers make up their minds without having before them an analysis (with prior public comment) of the likely effects of their decision upon the environment.  NEPA's object is to minimize that risk, the risk of uninformed choice . . . .").

Here, the Plaintiffs assert a NEPA claim, claiming that the BIA was required to perform an Environmental Assessment for all actions not categorically excluded or listed as exceptions. *Second Am. Compl.* ¶¶ 109-114.  Under *Ohio Forestry,* the claim is ripe when the procedural failure takes place – so long as the plaintiff has standing and is injured by the alleged failure to

comply.[16]   However, despite the procedural nature of Plaintiff's alleged injury, the three-factor ripeness analysis under *Ohio Forestry* weighs in favor of the Defendants.   First, it does not appear that delayed review would cause hardship to NN, because the lease approval process is not yet complete.   The Categorical Exclusion Checklist makes clear that the BIA has merely approved the lease for site investigation purposes, and will be a "Cooperating Agency" with FERC for the development of an environmental impact statement.   Thus, it does not appear that the BIA completely disregarded the environmental impact of the eventual LNG terminal, and NN will have plenty of opportunities to offer its input during the decisionmaking process.   Second, judicial intervention would inappropriately interfere with further administrative action in this case, because the administrative process – with respect to both the BIA and FERC – is ongoing. The reasoning of the court in *Bull Creek* resonates here: "If all of the conditions are not met, Plaintiffs['] alleged injuries from the Proposed Lease will never materialize.   In addition, if all of the conditions are not met, the BIA will not certify the Proposed Lease and it will be immaterial whether or not there was proper approval by the tribe."   *Bullcreek*, 426 F. Supp. 2d at 1227. Similarly, if Quoddy Bay is unable to obtain a FERC permit, it will be immaterial whether the BIA had conducted a preliminary environmental assessment; in addition, if the EIS process reveals some environmental dangers and proposes some remediation measures, NN's concerns will likely be assuaged.   Finally, the Court would likely benefit from further factual development

---

[16] There is no *Ohio Forestry* analogue for NHPA claims, but like NEPA, NHPA imposes procedural requirements, mandating that an agency take into account the effect of any undertaking on historical sites and allow an opportunity for comment.  *See Save Our Heritage, Inc. v. Fed. Aviation Admin.,* 269 F.3d 49, 57-58 (1st Cir. 2001) (citing 16 U.S.C. § 470f).   Furthermore, in 1999, new NHPA regulations came into effect formally integrating NEPA procedures into the NHPA process.  *See Preservation Coal. of Erie County v. Fed. Transit Admin.,* 356 F.3d 444, 453 (2d Cir. 2004) (citing 36 C.F.R. § 800.8 (eff. June 17, 1999)); *see also San Carlos Apache Tribe v. United States,* 417 F.3d 1091, 1096 (9th Cir. 2005) (finding NEPA to be a "close statutory analog" to NHPA).   There is every reason to conclude then, that like a NEPA violation, a NHPA violation is ripe "at the time the failure takes place," *Ohio Forestry,* 523 U.S. at 737.  *See also Kentucky Heartwood, Inc. v. Worthington,* 20 F. Supp. 2d 1076, 1090 (E.D. Ky. 1998) (reviewing a NFMA claim linked to NEPA); *Sierra Club v. United States Dep't of Energy,* 287 F.3d 1256, 1264 (10th Cir. 2002) (extending *Ohio Forestry* to the Endangered Species Act).   The Defendants, however, do not articulate a ripeness argument with respect to the ESA claim.

of the issue at hand.  NN's claim would be much riper on the heels of the FERC permitting process, after the BIA and FERC have completed the EIS and determined what, if any, environmental detriments will be caused by an LNG terminal.  If the purpose of NEPA, as articulated in *Watt*, is to avoid situations in which the government agency makes an uninformed decision and cannot undo the environmental harm, this is not that situation.[17]  Had the BIA given a final, irrevocable stamp of approval on the ground lease without considering any potential detrimental effects on the environment or on historic properties, NN would have a ripe claim under NEPA and NHPA.  But since that is not the case here, NN's claims are not justiciable.

### 2. Trust Obligation

With respect to the trust obligation claim, NN's allegations are twofold: Defendants breached their trust obligation by failing  to (1) determine a fair annual rental of the property; and (2) assess the impact of the lease on endangered whales.  *Second Am. Compl.* ¶¶ 115-122.  In their Supplemental Motion to Dismiss, Defendants reiterate their ripeness argument with respect to the NN's breach of trust obligation claim: that the lease approval is contingent and limited in scope to allow Quoddy Bay to merely investigate the suitability of the site for an LNG terminal, and that NN's right to challenge the decision is not prejudiced by delay in judicial review of this claim.  *Suppl. Mot.* at 8-12.  For the reasons stated above, the Court concludes this claim also lacks ripeness.

---

[17] *Watt* involved a preliminary injunction issued by a district court on the day before a scheduled oil lease sale was set to take place.  716 F.2d at 947.  The alleged procedural harm was that the DOI had failed to supplement its final EIS.  *Id*. at 948.  The First Circuit upheld the preliminary injunction, ruling that the decision not to supplement the EIS was not reasonable, such that the EIS "did not describe the likely environmental harms well enough to allow the Secretary to make an informed decision."  *Id*.  The ripeness claim in *Watt* – arising on the day before the potential harm – was much stronger than NN's ripeness claim in this case, where the concrete injury may never occur.  Furthermore, in *West v. Secretary of the DOT*, 206 F.3d 920 (9th Cir. 2000), the DOT, in connection with the Federal Highway Administration, determined that a proposed highway construction plan satisfied the criteria for a categorical exclusion under NEPA, allowing the construction to commence without a more extensive EIS.  *Id*. at 924.  Here, construction cannot begin at least until an EIS is prepared by FERC, with the BIA serving as a cooperating agency.

### B.  Standing

#### 1.  Article III Standing

##### a.  NEPA Standing

The Supreme Court has written that "irreducible constitutional minimum of standing contains three elements":  (1) "an injury in fact"; (2) "a causal connection between the injury and the conduct complained of"; and, (3) likelihood that the injury will be "'redressed by a favorable decision.'"  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (citations omitted). Defendants point out that the LNG terminal has not been constructed and may never be constructed, and therefore any injury is purely speculative.  *Defs.' Mot.* at 12-13.  They note that even after the lease was approved on June 1, 2005, *Compl.* ¶ 97, the Tribe was able to gather at Split Rock for the  canoe launching ceremony on September 4, 2005,  *Compl.* ¶ 8, apparently without incident.  They contend, therefore, there is no injury in fact.  In response, Plaintiffs argue that they have and are suffering injury in fact because of:  (1) their geographical nexus to the proposed project site; (2) the increased risk to their concrete interests in using and enjoying the Split Rock; and, (3) the lack of opportunity for public participation as required by the procedural mandates of NEPA and NHPA.  *Pls.' Opp'n* at 9.

With regard to the issue of procedural injury, Justice Scalia's dictum in *Lujan* adds a wrinkle to the analysis:

> The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy.  Thus, under our case law, one living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered, and even though the dam will not be completed for many years.

504 U.S. at 572 n.7.  The Ninth Circuit summed up the *Lujan* test: "(1) that he or she is a 'person who has been accorded a procedural right to protect [his or her] concrete interests . . . .' and (2) that the plaintiff has 'some threatened concrete interest . . . that is the ultimate basis of [his or her] standing.'"  *Douglas County v. Babbitt*, 48 F.3d 1495, 1500 (9th Cir. 1995) (citations omitted).  In *Dubois v. United States Dep't of Agric.*, the First Circuit addressed whether a plaintiff had standing to sue the Forest Service over its permit for the Loon Mountain Ski Area expansion, when his connection to the area was a period of residency some years before and annual visits to the area thereafter.  102 F.3d at 1282-83.  *Dubois* concluded that the allegations were sufficient to survive a motion to dismiss.

Relying on *Lujan* and *Dubois* and noting that they "are literally next door to the proposed LNG terminal site," Plaintiffs argue they have standing.  *Pls.' Opp'n* at 10.  No doubt Plaintiffs are as well-anchored to the situs of this action as the dam-dweller of *Lujan* or the annual visitor in *Dubois.*  But, it is worth retreating a step and re-examining the relevant question, which, for the moment, is injury.  Footnote seven came in the context of a discussion regarding the need to demonstrate personal concrete interests affected by ignoring a procedural requirement.  Finding the procedural injury alleged too generalized, *Lujan* expressly distinguished the situation where "plaintiffs are seeking to enforce a procedural requirement the disregard of which could impair a separate concrete interest of theirs (*e.g.*, the procedural requirement for a hearing prior to denial of their license application, or the procedural requirement for an environmental impact statement before a federal facility is constructed next door to them)."  504 U.S. at 572.  In footnote eight, *Lujan* specifically rejected the dissent's contention that "the Government's violation of a certain (undescribed) class of procedural duty satisfies the concrete-injury requirement by itself, without any showing that the procedural violation endangers a concrete interest of the plaintiff (apart

from his interest in having the procedure observed).”  *Id.* at 573 n.8.  Rather, noted the Court, Plaintiffs only have standing to enforce their procedural rights “so long as the procedures in question are designed to protect some threatened concrete interest . . . that is the ultimate basis of [their] standing.”  *Id.*

To fit this case within *Lujan,* then, Plaintiffs must show that the procedural requirement to evaluate environmental impact, if ignored, could impair a separate concrete interest of theirs. *See Douglas County,* 48 F.3d at 1500; *see also Vermont Pub. Interest Research Group v. United States Fish & Wildlife Serv.,* 247 F. Supp. 2d 495, 508 (D. Vt. 2002) (concluding that a NEPA plaintiff must demonstrate two kinds of injury to meet the injury in fact requirement:  injury of increased risk of environmental harm resulting from agency’s failure to comply with procedural obligations designed to promote informed decisionmaking and secondly that this increased risk injures their concrete interests) (citations omitted); *Sierra Club,* 287 F.3d at 1265.[18]

Turning first to the procedural violation, Plaintiffs allege that they are “injured by the BIA’s failure to comply with NEPA and NHPA because those are procedural statutes designed to protect precisely the interests asserted by Plaintiffs as adjacent landowners.”  *See Pls.’ Opp’n* at 11.  More specifically, Plaintiffs argue that both NEPA and NHPA require consultation with the tribal community or broader public, a requirement allegedly violated by the BIA.  They also find fault with the BIA’s issuance of a Categorical Exclusion and failure to conduct an EA or otherwise to make an informed decision, which could have “mitigate[d] or minimize[d] the impacts of the lease on Plaintiffs and the surrounding environment.”  *Pls.’ Opp’n* at 12; *see also Compl.* ¶¶ 108-113; 121-25.  In counter-attack, Defendants focus on causation and redressability,

---

[18] Though *Douglas County, Vermont Pub. Interest,* and *Sierra Club* are all NEPA cases, the similarity of NHPA and NEPA, *see supra* note 8, suggests that a similar analysis should apply.  The *Lujan* procedural-rights test has been extended to NHPA cases by other courts.  *See Coliseum Square Ass’n v. Dep’t of Hous. & Urban Dev.,* No. 02-2207, 2003 U.S. Dist. LEXIS 3367, *13-14 (E.D. La. Feb. 27, 2003).

but do not challenge whether Plaintiffs have indeed set forth a procedural violation. *See Defs.'*
*Reply* at 4 ("Plaintiffs also argue that they have standing to pursue their claims, based on their
allegations of procedural violations of NEPA and NHPA.  Merely alleging procedural violations
does not, however, relieve Plaintiffs from satisfying the causation and redressability
requirements of standing . . . .").

Having raised a procedural challenge, Plaintiffs must still show a concrete interest that is
affected by the violations of procedure, namely, the failure to comply with NEPA and NHPA.  A
better understanding of what *Lujan* intended by a "concrete interest" can be found earlier in the
opinion, when an injury in fact is described as "concrete and particularized." 504 U.S. at 560
(citations omitted).  "Particularized," in turn, is defined as "affect[ing] the plaintiff in a personal
and individual way."  *Id.* n.1.  Plaintiffs note that their interests rest on their geographic
proximity to the site and the fact that they "visit the now-leased Split Rock site throughout the
year to participate in religious and cultural ceremonies." *Pls.' Opp'n* at 10-11.  They argue that
"mere increased risk to [their] concrete interests to use and enjoy the Split Rock site is sufficient
to establish injury, despite whether the LNG terminal will ever be constructed." *Id.* at 11.

In procedural rights cases, the concrete interest test is not a particularly weighty one.  *See*
*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 183 (2000)
("[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the
affected area and are persons 'for whom the aesthetic and recreational values of the area will be
lessened' by the challenged activity"); *Ashley Creek Phosphate Co. v. Norton,* 420 F.3d 934, 938
(9th Cir. 2005) (noting that in NEPA cases, "plaintiffs who use the area threatened by a proposed
action or who own land near the site of a proposed action have little difficulty establishing a
concrete interest").

In support, Plaintiffs cite *TOMAC v. Norton,* 193 F. Supp. 2d 182 (D.D.C. 2002), *aff'd in relevant part by* 433 F.3d 852 (D.C. Cir. 2006). *TOMAC* involved a challenge to the BIA's decision to take land in trust for the Pokagon Band of Potawatomi Indians for the Band to build a casino. *Id.* at 185-86. Even though the casino had not yet been constructed and even though defendants argued that when it was built plaintiffs, neighboring landowners, would discover that their interests were well-protected, the court found that the neighbors had standing based on their asserted interests and that defendants' argument got ahead of the game. *See id.* at 187 n.1. *See also Lafleur v. Whitman,* 300 F.3d 256, 269 (2d Cir. 2002) (relying on plaintiff's "likely" exposure to emissions from a proposed facility near where she lives and works to establish injury). In *TOMAC,* the interests raised were potential injury to aesthetic and recreational interests, *see* 193 F. Supp. 2d at 187; similarly, here they are "Plaintiffs' interests in enjoying their properties, walking in their neighborhood, and conducting cultural and religious ceremonies . . . ." *See Pls.' Opp'n* at 11. *See also Citizens for Squirrel Point v. Squirrel Point Assocs.,* No. 03-193-P-H, 2003 U.S. Dist. LEXIS 21728, *9-10 (D. Me. Dec. 4, 2003) (noting that the injury in fact requirement may be satisfied by environmental or aesthetic injuries).

Defendants vociferously argue that "Plaintiffs . . . fail to show that such interests are diminished or placed at risk by the BIA's decision to allow the initial investigations of the Split Rock site." *Defs.' Reply* at 4. While seemingly a question of causation, *Lujan* also described an injury as "actual or imminent, not 'conjectural' or 'hypothetical.'" 504 U.S. at 560 (citation omitted). The Tenth Circuit explained that "[w]hether an increased risk will or will not occur due to the agency action determines whether a plaintiff has suffered injury in fact, not causation. Certainly, under the injury in fact prong, a plaintiff cannot merely allege that some highly attenuated, fanciful environmental risk will result from the agency decision; the risk must be

actual, threatened or imminent." *Comm. to Save the Rio Hondo v. Lucero,* 102 F.3d 445, 451-52 (10th Cir. 1996); *see also Sierra Club,* 287 F.3d at 1265 ("Sierra Club need only show that, in making its decision without following the NEPA . . . procedures, the agency created an increased risk of actual, threatened, or imminent environmental harm").

Count One, the NEPA count, contains Plaintiffs' contention that the ground lease by itself constitutes a "change in land use" because "prior to lease approval, the Split Rock site has been used for aesthetic, cultural and recreational purposes for time immemorial; now the land will be used for industrial purposes involving complex LNG facilities." *Compl.* ¶¶ 110-11. Although paragraph 112 of the Complaint is vague, *see id.* (noting that "the effects of the ground lease constitute extraordinary circumstances that preclude it from categorical exemption"), paragraph 113 makes it clear that Plaintiffs base the harm posed by the BIA's issuance of a Categorical Exclusion and its alleged failure to comply with NEPA on the construction, or at least the risk of construction, of a LNG terminal.[19]

---

[19] Paragraph 113 reads as follows:
   The ground lease agreement will:
   • Have significant impacts on public health or safety because of the high risks posed by LNG terminals, including risk of leaks, spills, fires, and explosions;
   • Have highly uncertain and potentially significant environmental effects or involve unique or unknown environmental risks because of the uncertainty surrounding the new LNG technology;
   • Have a direct relationship to other actions with individually insignificant but cumulatively significant environmental effects because the BIA's decision has set in motion a chain of events that will affect the environment, such as Quoddy Bay, LLC's application for a Submerged Lands Lease Option;
   • Have significant impacts on properties listed, or eligible for listing, on the National Register of Historic Places as determined by either the bureau or office because Split Rock is a property of cultural and religious significance to the Passamaquoddy Tribe;
   • Have significant impacts on species listed, or proposed to be listed, on the List of Endangered or Threatened Species, or have significant impacts on designated Critical Habitat for these species because of the endangered species inhabiting the Passamaquoddy Bay;
   • Violate a Federal law, or State, local, or tribal law or requirement imposed for the protection of the environment because the BIA did not consider the wishes of Indian Township, in violation of Indian Township's Resolution to protect ocean and natural resources;
   • Limit access to and ceremonial use of Indian sacred sites on Federal lands by Indian religious practitioners or significantly adversely affect the physical integrity of such sacred sites because the BIA's decision will allow Quoddy Bay, LLC to limit Plaintiffs access to Split Rock for ceremonial and religious use.

The problem for Plaintiffs, however, is that matters are not so straightforward.   The BIA's Categorical Exclusion and lease approval were carefully restricted only to site investigation purposes.  The Categorical Exclusion states:

> Federal approval is being provided to lease trust property on the Passamaquoddy Pleasant Point Reservation to Quoddy Bay, LLC for site investigation purposes. The Split Rock Site will be leased by Quoddy Bay, LLC to investigate the site for a potential Liquefied Natural Gas (LNG) terminal.  *The Bureau of Indian Affairs (BIA) lease approval is solely for the site investigation required for the Federal Energy Regulatory Commission (FERC) permitting process in the development of an Environmental Impact Statement (EIS).*  The project involves a shipping port and LNG pipeline construction, for which the complete environmental analysis and EIS development would be conducted through the FERC permitting process. *Continuing the lease beyond the investigation period is contingent upon FERC permit approval, acceptability of the EIS analysis and insignificant impact on the leased property.*  The BIA will be a Cooperating Agency for the EIS development through FERC.  BIA lease approval for the site investigation also requires that an archeologist with the authority to halt work be present to monitor any and all subsurface investigations.  Prior to any ground-disturbing investigations, a phase 1 archaeological site study will be conducted.   Work beyond initial site investigation will be contingent on the results of the phase 1 study . . . .

*Defs.' Mot. Ex. 5* (emphasis supplied).  By the BIA's own words, the agency approved the lease of the Split Rock site for site investigation purposes only and an EIS will later have to be conducted by the FERC, with the cooperation of the BIA, as to the impact of a LNG terminal.[20]

As the record shows, however, the Categorical Exclusion authorized only a narrow range of activity and the Plaintiffs have not asserted any injury from the approved Quoddy Bay investigation of the site.[21]   Rather, they focus on the approval as a first necessary step before the

---

*Id.*

[20]Plaintiffs have not alleged that by allowing Quoddy Bay to come onto Split Rock and investigate the site for purposes of the permitting process, the BIA violated NEPA and thereby posed a risk to the local environment. Instead, the Complaint makes clear that Plaintiffs' quarrel is not with any investigatory risks, especially in view of the evidence that to date the preliminary work by Quoddy Bay has not at all interfered with the use of Split Rock. Rather, Plaintiffs are concerned with the impact the actual construction of a LNG terminal would have upon their interests in Split Rock, and categorize the BIA's Categorical Exclusion as a declaration that the construction does not require an EA.

[21] Indeed, at oral argument, NN conceded that its members use of and access to the land has not been impeded in any way during the investigative period, which has spanned roughly 18 months since the BIA's approval of the lease.

actual injury takes place.  Thus, the Plaintiffs have not challenged the actions the BIA actually approved, and any related risks to the environment based on those actions, but only the consequences they fear will occur some time in the future, if other approvals are obtained.

The Plaintiffs have chosen their field of battle.  If they had selected to fight at the beachhead, claiming injury even with the first test boring, this would be a different case.[22] Instead, they have focused their challenge on the terminal's ultimate construction.  Having limited their challenge to something that may not happen, the Plaintiffs are vulnerable to the charge that they have alleged "an injury at some indefinite future time."  *Lucero*, 102 F.3d at 451.  This is particularly so, because the BIA has made its final approval expressly contingent upon the completion of a FERC-conducted EIS under NEPA, in consultation with the Tribe, and with the cooperation of the BIA.  Although there is no guarantee FERC will not issue the necessary permits, there is also no guarantee it will.  Therefore, Plaintiffs' fears of injury and resulting environmental harm from the potential construction of a LNG terminal are most properly deferred until after the FERC, with the assistance of the BIA, has evaluated the plans in accordance with NEPA.  Here, the BIA has only approved site investigation for permitting purposes, not proposed construction.  A third agency must become involved in the process and must conduct, in cooperation with the BIA, the same environmental analysis the Plaintiffs now seek.  Thus, the connection between the environmental risk and the agency decision is too "highly attenuated" to provide standing.  *See id.* at 451-52.

### b.  NHPA Standing

Having concluded that Plaintiffs lack standing to pursue the NEPA claim, the question remains whether the same conclusion must hold for their NHPA claim.  As has been discussed

---

[22] That is, the case would be different, but not necessarily successful, absent evidence not in this record that the investigation the BIA authorized caused a legally cognizable impingement on Split Rock.

earlier, *see supra* note 13, NHPA requires that "prior to a proposed federal 'undertaking,' the agency must 'take into account the effect' on . . . [historic] properties and allow the Advisory Council on Historic Preservation a 'reasonable opportunity to comment.'" *Save Our Heritage, Inc. v. Fed. Aviation Admin.,* 269 F.3d 49, 57-58 (1st Cir. 2001) (citing 16 U.S.C. § 470f).[23]  An "undertaking" is defined as a "project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including . . . (C) those requiring a Federal permit license, or approval."  16 U.S.C. § 470w(7); *see also* 36 C.F.R. § 800.16(y).  Adverse effects of an undertaking include "[t]ransfer, lease, or sale of a property out of Federal ownership or control without adequate and legally enforceable restrictions or conditions to ensure long-term preservation of the property's historic significance."  36 C.F.R. § 800.5(a)(2)(vii).  Like NEPA, the statute poses a procedural requirement that agency decisionmakers, "stop, look, and listen," but not that they reach particular outcomes.  *Narragansett Indian Tribe v. Warwick Sewer Auth.,* 334 F.3d 161, 166-67 (1st Cir. 2003).

While the agency official must complete the section 106 process "prior to the issuance of any license," agencies are encouraged to combine NHPA consultation efforts with the NEPA process.  *See* 36 C.F.R. §§ 800.1(c), 800.8; *Navajo Nation v. United States Forest Serv.,* 408 F. Supp. 2d 866, 880 (D. Ariz. 2006).  *See generally Save Our Heritage, Inc. v. Fed. Aviation Admin.,* 269 F.3d 49 (1st Cir. 2001).  Further, agency officials are not prohibited from "conducting or authorizing nondestructive project planning activities before completing compliance with section 106, provided that such actions do not restrict the subsequent

---

[23] Section 470f provides that the Advisory Council has an opportunity to comment with respect to properties which are "included in or eligible for inclusion in the National Register."  *Id.; Yankton Sioux Tribe v. Army Corps of Eng'rs,* 194 F. Supp. 2d 977, 991 (D.S.D. 2002).  Properties of "traditional religious and cultural importance to an Indian tribe" may be eligible for inclusion on the National Register.  16 U.S.C. § 470a(d)(6).  According to the Complaint, the BIA breached its duty under the statute and accompanying regulations by "failing to make reasonable and good faith efforts to determine if Split Rock had any cultural or religious significance which would prompt eligibility as a historic site under the NHPA."  *Compl.* ¶ 124.

consideration of alternatives to avoid, minimize or mitigate the undertaking's adverse effects on historic properties." 36 C.F.R. § 800.1(c); *see also Save Ardmore Coal. v. Lower Merion Twp.,* 419 F. Supp. 2d 663, 674-75 (E.D. Pa. 2005) (dismissing on ripeness grounds). *Nat'l Indian Youth Council v. Watt* is instructive on this issue. 664 F.2d 220 (10th Cir. 1981). In *Watt,* Plaintiffs challenged a surface mining, coal operation on the Navajo Reservation in New Mexico. They argued that the relevant NHPA action was improperly timed, coming as it did after the approval of the lease, and that a "complete survey of the leasehold and consultation with the Council should have preceded the approval of the 1976 lease." *Id.* at 227-28. The Tenth Circuit rejected these claims, noting:

> Although lease approval is necessary for mining on Tribal lands, no operations could have occurred until the approval of the Mining Plan under SMCRA and the pertinent regulations . . . . Approval of the Mining Plan, not approval of the lease, is the federal action which might affect historic sites. Study and evaluation of the . . . project went on for many years. The original proposal encompassed 40,000 acres. The approved mining operations for the first year were confined to eight acres plus 57 acres for needed facilities. The argument that a complete survey must be made of 40,000 acres before mining begins on eight acres borders on the absurd.

*Id.* at 228.

Likewise, if the gravamen of Plaintiffs' grievance here is similar to its NEPA claim, namely, that BIA erred by ignoring the effects a proposed LNG terminal would have on the environment, this Court must conclude that the time to assert such a claim has not yet arisen because Plaintiffs have not demonstrated an injury in fact. Given the limited scope of the BIA's approval, the time to evaluate the much larger effects of the proposed LNG terminal on the "long-term preservation of Split Rock's historic significance," *Compl.* ¶ 125, would be during the FERC's permitting process, when those effects are analyzed in conjunction with NEPA.

In the Complaint, the scope of Plaintiffs' NHPA grievance is somewhat unclear. Plaintiffs have posited a NHPA count, *see Compl.* ¶¶ 121-125, asserting that the BIA breached its duty "by failing to consult with the tribe before approving the ground lease on a site of religious and cultural significance to the Passamaquoddy Tribe and which is eligible for listing on the National Registry of Historic Places," *Compl.* ¶ 123, by "failing to make reasonable and good faith efforts to determine if Split Rock had any cultural or religious significance which would prompt eligibility as a historic site under the NHPA," *Compl.* ¶ 124, and by "approving the lease of Split Rock without adequate and legally enforceable restrictions or conditions to ensure long-term preservation of Split Rock's historic significance." *Compl.* ¶ 125.  In other words, according to the allegation, the BIA has not made any efforts to comply with NHPA. Plaintiffs' argument is that NHPA should have been complied with because the lease approval does not provide adequate safeguards for the preservation of a site of religious and cultural significance – but Plaintiffs do not elaborate.

Here, the BIA's Categorical Exclusion included the express provisions that "an archeologist with the authority to halt work be present to monitor any and all subsurface investigations" and that "[p]rior to any ground-disturbing investigations, a phase 1 archeological site study will be conducted" and "[w]ork beyond initial site investigation will be contingent on the results of the study." *Categorical Exclusion* at 1.  The Plaintiffs' NHPA grievance, however, is undermined by a basic contradiction:  since NHPA requires an investigation into the site's historical and archeological significance, a mandated investigation into that significance – as provided by the Categorical Exclusion – cannot violate the NHPA requirement.

Moreover, if their argument is that the lease approval should have invoked NHPA protections because the BIA committed a historic site to an LNG terminal, then, as this Court has

noted, Plaintiffs have misjudged the scope of the BIA's action and their quarrel does not reflect an injury in fact. If, however, their argument is that the lease approval should have invoked NHPA protections because the BIA subjected Split Rock to industrial site investigations incompatible with its historic significance, then the time to act is now.[24] However, any ambiguity in the Complaint is cured by Plaintiffs' responsive motion, which makes clear that the basis for Plaintiffs' NHPA claim is the same as the basis for its NEPA claim. *See, e.g., Pls.' Opp'n* at 1 ("Plaintiffs . . . have filed a complaint alleging that the Bureau of Indian Affairs ("BIA") violated . . . (2) the National Historic Preservation Act ("NHPA") . . . when it approved a fifty year ground lease authorizing construction and operation of a liquefied natural gas (LNG) facility on sacred tribal grounds known as Split Rock"); *Pls.' Opp'n* at 11 ("NEPA and NHPA require informed decisionmaking before the BIA approves a fifty-year industrial lease"). The motion to dismiss must therefore be granted as to both the NEPA and NHPA claims, because Plaintiffs have failed to demonstrate any injury in fact.

### c. ESA Standing

In their complaint under docket number 06-50-B-W, NN alleges that Defendants violated Section 7 of the Endangered Species Act (ESA). *ESA Compl.* ¶ 63. Under that provision of the ESA, a federal agency must consult with the U.S. Fish and Wildlife Service (FWS) or the National Marine Fisheries Services (NMFS) to insure that any agency action "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species . . . ." 16 U.S.C. § 1536(a)(2). The regulations promulgated under the ESA define "jeopardize the continued existence of" to mean "engage in an action that reasonably would be expected, directly or indirectly, to reduce

---

[24] It could well be that such site investigations would qualify as an authorization of "nondestructive project planning activities" under 36 C.F.R. § 800.1(c), but that is a question that would have to await a decision on the merits.

appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02.

This consultation requirement does not apply in all situations. *See, e.g., Defenders of Wildlife v. Flowers*, 414 F.3d 1066, 1070 (9th Cir. 2005) (holding that a "no effect" finding by the Army Corps of Engineers was not arbitrary or capricious); *Ground Zero Ctr. for Non-Violent Action v. United States Dep't of the Navy*, 383 F.3d 1082 (9th Cir. 2004) (finding that the remote risk of an explosion did not invoke the consultation requirement); *Newton County Wildlife Ass'n v. Rogers*, 141 F.3d 803, 811 (8th Cir. 1998). Rather, it applies to those cases in which an agency action is likely to have a detrimental impact on an endangered species. *See* 50 C.F.R. 402.10 ("Each Federal agency shall confer with the Service on any action which is likely to jeopardize the continued existence of any proposed species or result in the destruction or adverse modification of proposed critical habitat."). The Ninth Circuit has outlined the framework for analysis under the regulations as follows:

> Before initiating any agency action in areas containing protected species, the agency must (1) independently determine whether its action "may affect" a protected species or its habitat or (2) initiate a formal consultation with the Service having jurisdiction over the species - here, the FWS. If the agency determines its proposed action "may affect" protected species or habitat, the agency is required to initiate formal consultation. An agency may avoid formal consultation only when it has determined the proposed action is unlikely to adversely affect the protected species or habitat and the FWS concurs with that determination.

*Tinoqui-Chalola Council of Kitanemuk & Yowlumne Tejon Indians v. United States Dep't of Energy*, 232 F.3d 1300, 1306 (9th Cir. 2000).

Defendants argue that, because the BIA action in this case – limited approval of a lease for investigative purposes – will not directly affect the habitat, they were not bound by the consultation requirements set forth in the ESA regulations. *See Suppl. Mot.* at 17. In addition,

28

Defendants assert that the Plaintiffs' claim relies on too many assumptions: that FERC will not comply with the ESA regulations when completing its approval procedures, and that the enforcement mechanisms that are already in place will somehow break down. *Id.* Instead, Defendants argue, the construction of the LNG terminal is contingent upon the completion of the FERC permitting process, which entails a finding by the NMFS that "the project will not jeopardize the continued existence of listed whales." *Id.* at 18. In sum, the Defendants argue that "because Quoddy Bay has not yet obtained a Federal Energy Regulatory Commission permit and thus cannot construct or operate the contemplated Liquefied Natural Gas terminal, the harms Plaintiffs claim will occur as a result of the operation of the Liquefied Natural Gas terminal are too speculative to establish standing." *Id.* at 19.

Plaintiffs respond by first addressing the injury-in-fact requirement from *Lujan*, asserting that "where violations of procedural rights are alleged, standing requirements are lessened," citing *Lujan* footnote 7. NN contends that they have standing because of the procedural injury that was caused by the BIA's failure to consult in accordance with the ESA regulations during the lease approval process. *Pls.' Suppl. Opp'n* at 4-5. Furthermore, Plaintiffs argue that the BIA is trying to impermissibly "delegate its consultation obligation to FERC." *Id.* at 6.[25]

Plaintiffs rely on *Bennett v. Spear*, 520 U.S. 154 (1997). NN contends that *Bennett* stands for the proposition that "environmental plaintiffs do have standing in procedural harm cases where the ultimate injury might be avoided by intervening events." *Pls.' Suppl. Opp'n* at 8. In *Bennett*, the plaintiffs – two Oregon irrigation districts – challenged a biological opinion issued by the FWS in accordance with the ESA, which found that an irrigation project called the Klamath Project could be detrimental to several species of fish. *Id.* at 157. The plaintiffs

---

[25] This question, however, is not relevant for determination of standing because it does not go to injury in fact. Rather, it is related to the merits of NN's ESA claim.

claimed that there was no evidence that the alternatives suggested by the FWS would have a beneficial effect upon the species, and that the restrictions would detrimentally affect plaintiffs' use of certain reservoirs and waterways.  *Id*. at 159-60.  Thus, the ultimate injury alleged was not with respect to any endangered species, but rather to the plaintiffs' economic interests.  *Bennett* is further distinguishable because that case involved a situation in which the agency action in question – a biological opinion – had a "virtually determinative effect."  *Bennett*, 520 U.S. at 170.  In contrast, the BIA's action in approving the lease is not directly linked to the ultimate potential injury, and cannot be said to be determinative.[26]

Even if Plaintiffs have effectively alleged a procedural violation, they fall short of the injury in fact requirement under *Lujan*.  Asserting that Plaintiffs have a "concrete, cognizable interest in endangered whales, they state: "This interest is directly threatened by the BIA's approval of the Split Rock site for the LNG terminal and its resultant ship traffic."  *Pls.' Suppl. Opp'n* at 8.  This argument falls prey to the same standing problems under NEPA and NHPA, in that it misstates the causal link between the two actions.  The BIA's approval of the lease will not directly result in the construction of the LNG terminal.  Rather, the lease approval is contingent upon other events -- including FERC licensing -- and is revocable if any of those contingencies do not occur.  Although *Lujan* lowered the threshold for standing in cases alleging procedural injury for redressability and immediacy, it did not completely eliminate the injury in fact requirement or the other considerations under *Lujan*.

---

[26] Plaintiffs also cite *National Wildlife Federation v. Coleman*, 529 F.2d 359 (5th Cir. 1976), to support their argument that "[t]he fact that [the impacts on endangered species] may be "indirect effects" of the lease approval is irrelevant under the ESA."  *Pls.' Supp. Opp'n* at 5-6.  Plaintiffs were likely referring to the following passage in that case: "Although it is clear that the crane can survive the direct loss of 300 acres of habitat, the evidence, including the FEIS, shows that it is questionable whether the crane can survive the additional loss of habitat caused by the *indirect effects* of the highway, coupled with the excavation of and drainage caused by borrow pits."  *National Wildlife Federation*, 529 F.2d at 373 (emphasis supplied).  The Plaintiffs' attempt to equate the BIA's limited approval of a lease with the actual construction of a highway project is unpersuasive.

Plaintiffs next address the second standing requirement – that the Plaintiffs' injury is "fairly traceable" to the BIA's failure to comply with the ESA's regulations, claiming that "the BIA's [lease] approval increases the risk that endangered whales may be harmed because it makes it more likely that the proposed LNG terminal will be built at Split Rock." *Pls.' Suppl. Opp'n* at 11. Plaintiffs' argument that the BIA's lease approval is a "but for" cause of the construction of the terminal misses the mark. The causation analysis under *Lujan* should be whether the narrowly circumscribed lease approval is a "but for" cause of any potential harm to an endangered species. The practical application of the ESA on this case is that the BIA was required to insure that its action in approving the ground lease, in and of itself, was not likely to jeopardize the existence of any endangered species. At oral argument of the motion to dismiss, Plaintiff conceded that the approval of the lease – which was limited in scope to allow Quoddy Bay to conduct investigation of the site – itself has not affected their access to the land. Likewise, there is no basis to conclude that the approval of the lease had an immediate impact upon the marine species that Plaintiffs name in their complaint. Therefore, the BIA was not required to confer with FWS or NMFS at this early stage to ascertain the impact of the lease approval on any endangered species.

Finally, Plaintiffs address the third standing requirement under Lujan, arguing that the Court "may redress Plaintiffs' injury by setting aside the lease approval and directing the BIA to consult with the NMFS before making another decision." *Pls.' Suppl. Opp'n* at 12. Plaintiffs cite *Citizens for Better Forestry v. United States Dep't of Agric.*, 341 F.3d 961 (9th Cir. 2003), which states: "A petitioner who asserts inadequacy of a government agency's environmental studies . . . need not show that further analysis by the government would result in a different conclusion. It suffices that . . . the [agency's] decision *could be influenced* by the environmental

considerations that [the relevant statute] requires an agency to study."  *Id.* at 976 (citation and internal quotation marks omitted) (emphasis and alterations in original).  Although it is possible that requiring the BIA to engage in formal consultation with FWS and NMFS before approving the lease might result in a different result, this Court reiterates that the ESA does not require consultation in all cases, only in those cases in which the agency action is likely to affect an endangered species.  Therefore, this Court finds that Plaintiffs lack standing to bring their ESA claim.

### 2.  Prudential Considerations:  Group Rights and the Rights of the Tribe Under the Leasing Act

Interwoven with the Article III elements are prudential considerations that limit the cases a court may hear, including the requirement that a "plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties."  *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 955 (1984) (citations omitted).  *Accord Osediacz v. City of Cranston,* 414 F.3d 136, 139 (1st Cir. 2005) ("The prudential aspects of standing include 'the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked.") (citation omitted).  A membership organization has a limited exception to the general bar on the assertion of third-party rights, as it "may assert the claims of its members, provided that one or more of its members would satisfy the individual requirements for standing in his or her own right."  *Dubois,* 102 F.3d at 1281.  Defendants argue that Plaintiffs "cannot adequately represent the interests of Indian Township

and the Tribe" and thus move for the dismissal of Count Two, the alleged violation of the Leasing Act and Trust Obligation. *Defs.' Mot.* at 15.[27]

More fully, Defendants argue that Plaintiffs, a "group of private citizens who are residents of the Pleasant Point Passamaquoddy Reservation," *Compl.* ¶ 5, base their claim at least in part on injury allegedly sustained by Indian Township. *See, e.g., Compl.* ¶ 105 (discussing failure of Defendants to consult with Indian Township); *id.* ¶ 118 (discussing failure of Defendants to consider the wishes of Indian Township). Noting that, as alleged by Plaintiffs, Pleasant Point and Indian Township are "two distinct reservation areas," *Compl.* ¶¶ 62-64, Defendants claim that Plaintiffs "fail to make sufficient allegations or offer any evidence to show that they possess standing to adequately represent Indian Township." *Defs.' Mot.* at 16. With respect to the Tribe, Defendants cite authority for the proposition that "[t]ribal property interests and governmental authority flow from reserved treaty rights and are secured to recognized Indian tribes as distinguished from individual Indians." *Id.* Noting that Plaintiffs do not claim any individual property right in the Split Rock site, *see Pls.' Opp'n* at 21, Defendants argue that it is the Tribe, not its members, which has the standing to assert any alleged injury to rights stemming from tribal property transactions. *Defs.' Mot.* at 17. Finally, to the extent that Plaintiffs challenge the Tribal Resolution itself, Defendants argue that this Court should not insert itself into what is essentially an intra-tribal dispute. *Defs.' Mot.* at 18.

Unsurprisingly, Plaintiffs disagree, offering a broader interpretation of the Leasing Act which would extend to individual tribal members as well. Arguing that their interests are within the zone of interests protected by the Leasing Act, Plaintiffs ask this Court to conclude that they

---

[27] Defendants also argue that Plaintiffs' NEPA claim alleges a potential injury to Indian Township, and that "[o]n this additional basis, Plaintiffs lack the requisite standing to pursue a portion of their NEPA claim." *See Defs.' Mot.* at 15-16 n.5 (citing *Compl.* ¶ 113). Because this Court has already found that Plaintiffs lack standing to pursue their NEPA claim on constitutional grounds, *see supra* IV.b.i, this argument will not be addressed.

33

have standing.  *Pls.' Opp'n* at 20-23.  At stake then, here, are really <u>two</u> prudential standing concerns:  the assertion of third party rights and the zone of interests.  *See Osediacz,* 414 F.3d at 139.  Plaintiffs concede that they have no property interest in Split Rock, but contend that they are members of a class (i.e. individual tribal members) protected by the Leasing Act and therefore, they have an enforceable right based on the BIA's alleged failure to adequately protect tribal property and resources.  But, a closer look at the Leasing Act suggests otherwise.

In relevant part, the Leasing Act allows "[a]ny restricted Indian lands, whether tribally or individually owned, may be leased *by the Indian owners*, with the approval of the Secretary of the Interior . . . ."  25 U.S.C. § 415(a) (emphasis supplied).  An Indian landowner is defined in the regulations as "a tribe or individual Indian who owns an interest in Indian land in trust or restricted status."  25 C.F.R. § 162.101.  Plaintiffs are almost certainly correct that the Leasing Act was intended to protect "Indian tribes *and their members*."  *See San Xavier Dev. Auth. v. Charles,* 237 F.3d 1149, 1153 (9th Cir. 2001) (emphasis supplied).  However, as the statutory language and regulations make clear, it is tribes and members in their ownership capacity to which the BIA owes a duty under this statute.  Likewise, it is only Indian landowners who are within the zone of interests protected by the Leasing Act.  *See Bullcreek v. Dep't of the Interior,* 426 F. Supp. 2d 1221, 1230 (D. Utah 2006); *Rosebud Sioux Tribe v. McDivitt,* 286 F.3d 1031, 1036-37 (8th Cir. 2002).  *See also Defs.' Reply* at 6 n.9 ("Moreover, while Plaintiffs are correct that the Indian Long-Term Leasing Act references both tribally and individually owned Indians (sic) lands, it is clear that the Split Rock site is tribal property.  Thus, any obligations Defendants might owe to individual Indian property owners pursuant to the Act are not at issue here").[28]   If mere tribal membership were sufficient to assert a violation of the Leasing Act on behalf of the

---

[28] Having decided the issue on these grounds, this Court will not address Defendants' additional argument that this is an intra-tribal matter over which the Court should decline to exercise jurisdiction.

Tribe or other individual owner, the statute's restricted application to "tribe or other individual Indian who owns an interest in Indian land" would be meaningless.

Count 2 of the Plaintiffs' Second Amended Complaint alleges a violation of the Indian Long-Term Leasing Act and Trust Obligation. The Count alleges that the Defendants violated the Leasing Act and then states in paragraph 121:

> Defendants violated their Trust Obligation to determine a fair annual rental under 25 C.F.R. part 162 by failing to do a fair market value appraisal in conformance with the BIA's Appraisal Handbook.

They then allege in paragraph 122:

> Defendants breached their Trust Obligation by failing to protect and preserve Plaintiffs' right to access the sacred Split Rock site when it approved the fifty year ground lease without any consideration of the impacts on endangered whales.

It is unclear whether the Plaintiffs contend that the trust obligation authorizes a separate cause of action for a general breach of fiduciary duty apart from a violation of statute or regulation. If so, this is incorrect. There is a "unique trust relationship between the United States and the Indians." *County of Oneida v. Oneida Indian Nation,* 470 U.S. 226, 247 (1985); *see also Okanogan Highlands Alliance v. Williams,* 236 F.3d 468, 479 (9th Cir. 2000) ("Federal agencies owe a fiduciary responsibility to Native American tribes."). However, even though the United States does "owe a general trust responsibility to Indian tribes, unless there is a specific duty that has been placed on the government with respect to Indians, this responsibility is discharged by the agency's compliance with general regulations and statutes not specifically aimed at protecting Indian tribes." *Morongo Band of Mission Indians v. Fed. Aviation Admin.,* 161 F.3d 569, 574 (9th Cir. 1998); *see also Brown v. United States,* 86 F.3d 1554, 1563 (Fed. Cir. 1996).

In *United States v. Navajo Nation*, the Supreme Court addressed a case where, as here, the plaintiff asserted a breach of trust in connection with the Secretary's approval of a lease negotiated by the Tribe and a third party.  537 U.S. 488 (2003).  Despite its finding that the Secretary had "flagrantly dishonored the best interests of . . . the Tribe," *id.* at 501, the Federal Court of Claims granted summary judgment because the Tribe had failed to "link that breach of duty to any statutory or regulatory obligation which could 'be fairly interpreted as mandating compensation for the government's fiduciary wrongs.'" *Id.* (quoting *Navajo Nation v. United States,* 46 Fed. Cl. 217, 236 (2000)).  The Court of Appeals for the Federal Circuit reversed.  Relying on 25 U.S.C. § 399, the appeals court concluded that "the measure of control the Secretary exercised over the leasing of Indian lands for mineral development sufficed to warrant a money judgment against the United States for breaches of fiduciary duties . . . ." *Id.*

Judge Schall concurred in part and dissented in part.  He maintained it "was not enough . . . for the Tribe to show a violation of a general fiduciary relationship stemming from federal involvement in a particular area of Indian affairs.  Rather, a Tribe 'must show the breach of a specific fiduciary obligation that falls within the contours of the statues and regulations that create the general fiduciary relationship at issue.'" *Id.* (quoting *Navajo Nation,* 46 Fed. Cl. at 1341).

The Supreme Court reversed, explaining that because the United States may not be sued without its consent, the subject matter jurisdiction to hear such a claim must arise from what is known as the Indian Tucker Act, 28 U.S.C. § 1505.  *Navajo Nation*, 537 U.S. at 502.  The Court concluded that "[h]owever one might appraise the Secretary's intervention in this case, we have no warrant from any relevant statute or regulation to conclude that his conduct implicated a duty enforceable in an action for damages under the Indian Tucker Act."  537 U.S. at 514.   In

36

searching for statutory or regulatory support for the Tribe's assertion of a breach of fiduciary duty and finding none, *Navajo Nation* supports the conclusion that a generalized claim of violation of a fiduciary duty, which is not tethered to any statute or regulation, cannot stand.

Under the Endangered Species Act (ESA), prudential standing is analyzed somewhat differently. First, the broad language of the ESA – "any person may commence a civil suit" -- greatly expands the so-called "zone of interests" test. *Bennett v. Spear*, 520 U.S. 154, 164 (1997). Under the "zone of interests" test, the question becomes "whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Association of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970); *see also Maine v. Norton*, 257 F. Supp. 2d 357, 375 (D. Me. 2003) (involving a substantive, not procedural, challenge under the ESA). The Supreme Court reasoned that the "subject of the legislation," that is, the environment, "makes the intent to permit enforcement by every man even more plausible." *Bennett v. Spear*, 520 U.S. 154, 166 (1997). NN arguably meets the standard for prudential standing under the ESA. However, without an "injury in fact," the Plaintiff still does not meet the tripartite test under *Lujan*, which is the threshold inquiry.

### C.  APA

Defendants' final argument is that the APA claim must fail as Plaintiffs' other statutory claims warrant dismissal and the APA "provides the waiver of sovereign immunity for Plaintiffs to bring their challenge to BIA's actions; it does not, in and of itself, create a private right of action." *See Defs.' Mot.* at 19. Defendants are correct on the law. *See Califano v. Sanders,* 430 U.S. 99, 107 (1977) (holding that "the APA does not afford an implied grant of subject-matter jurisdiction permitting federal judicial review of agency action"); *Your Home Visiting Nurse*

*Servs., Inc. v. Shalala,* 525 U.S. 449, 457-58 (1999).  *Accord Conservation Law Found., Inc. v. Busey,* 79 F.3d 1250, 1261 (1st Cir. 1996) (noting that "[w]hile the APA does not provide an independent source of subject matter jurisdiction, it does provide a federal right of action where subject matter jurisdiction exists under 28 U.S.C. § 1331 (giving district courts jurisdiction of all civil actions arising under the laws of the United States)").  Since this Court has dismissed Plaintiffs' other claims, the APA claim must be dismissed as well.

## V.  Conclusion

Because the Plaintiff lacks standing to bring its claims, and the claims are not ripe for adjudication, the Court GRANTS Defendants' motion to dismiss (Docket # 12) and supplemental motion to dismiss (Docket # 32).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 16th day of November, 2006